# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| STEVE WILLIS, ETC., ET AL., ) | |
| ) | |
| Plaintiffs, ) | Case No. 2:06CV00015 |
| ) | |
| v. ) | **OPINION** |
| ) | |
| **RONALD D. OAKES, ETC., ET AL.,** ) | By: James P. Jones |
| ) | Chief United States District Judge |
| ) | |
| Defendants. ) | |

*Clifton L. Corker, Johnson City, Tennessee, Douglas T. Jenkins, Rogersville, Tennessee, Charles R. Terry and F. Braxton Terry, Terry Terry & Stapleton, Morristown, Tennessee, for Plaintiffs; Henry S. Keuling-Stout, Keuling-Stout, P.C., Big Stone Gap, Virginia, for Defendants Andrew Drake McNally and John Patrick Oliver Yost.*

In this action for damages resulting from a police shooting, I find that the defendant police officers are entitled to summary judgment in their favor.

I

During a confrontation on July 7, 2005, between Kirby Willis and two Wise County, Virginia, sheriff's deputies, Andrew McNally and John Yost, Deputy McNally fired three shots at close range from his pistol at Kirby Willis, killing him. The shots also accidently wounded Kirby's cousin, Bruce Willis, and the other officer, Deputy Yost. This action was thereafter brought by the administrators of

Kirby Willis' estate and Bruce Willis against the two officers under 42 U.S.C.A. § 1983 (West 2003), seeking damages.[1]  Following discovery, the defendants have moved for summary judgment in their favor, claiming that they are entitled to judgment in their favor on the ground, among others, that they have qualified immunity.  The issues have been briefed and argued and are ripe for decision.[2]

The facts in the case, as shown by the summary judgment record, are as follows.

Deputy Andrew McNally ("Deputy McNally") of the Wise County, Virginia, Sheriff's Department was about to finish his shift at 12:30 A.M. when he overheard a conversation between central dispatch and Deputy John Yost ("Deputy Yost") regarding a person named Merita Barnett.  Central dispatch had contacted Deputy Yost to see if he had an outstanding warrant for Barnett's arrest.  Deputy Yost confirmed that he did, charging her with threatening to burn a dwelling.  Deputy McNally then called Deputy Yost directly and told him that he had just seen Barnett walking near Powell Valley High School in Big Stone Gap, Virginia.  Deputy

---

[1] The plaintiffs also originally sued Wise County, Virginia, the sheriff of Wise County, the Town of Big Stone Gap, the chief of police of Big Stone Gap, and a John Doe police officer, but all of those defendants have been dismissed, voluntarily or otherwise.

[2] The court previously ruled on motions to dismiss in the case.  *See Willis v. Oakes*, No. 2:06CV00015, 2006 WL 2431400 (W.D.Va. Aug, 22, 2006); *Willis v. Oakes*, No. 2:06CV00015, 2006 WL 1589600 (W.D.Va. June 9, 2006).

McNally said that he would arrest her and that Deputy Yost could meet them to transport Barnett back to the station.

Deputy McNally then drove to the Double Kwik convenience store and Exxon gas station near the high school to find Barnett. When he arrived, he saw Barnett in a secluded part of the parking lot, away from the gas pumps and the store, talking to a person in a black Chevrolet Tahoe SUV. Barnett was known to Deputy McNally as a drug user and dealer and this was an area known for drug dealing.

Deputy McNally drove up to Barnett and told her there was a warrant for her arrest. As Deputy McNally was talking to Barnett, the driver of the Tahoe, Jonathan Kirby Willis ("Kirby"), moved his vehicle forward so that it was door-to-door with McNally's. Without being questioned, Kirby told Deputy McNally that he did not know the girl and was going to leave. Deputy McNally felt that Kirby appeared nervous and glassy-eyed and he told Kirby to stay put. Kirby complied.

Deputy McNally handcuffed Barnett and placed her in his car. Barnett told Deputy McNally that she did not know Kirby or his passenger, Bruce Willis ("Bruce"), but that they had been talking for about ten minutes and the men had asked her if she wanted to smoke marijuana with them. Another man named Donald Gilliam, who was also known to Deputy McNally as a drug user and dealer, came over to talk to Barnett, and Deputy McNally told him to leave.

-3-

Case 2:06-cv-00015-JPJ-PMS   Document 115   Filed 06/19/07   Page 3 of 18   Pageid#: 975

Deputy McNally then returned to Kirby's SUV and asked both Kirby and Bruce to provide identification. Bruce immediately produced a Virginia driver's license. Kirby fumbled around in the vehicle and finally showed the officer a Tennessee license. After checking the licenses, Deputy McNally discovered that Kirby was licensed in Tennessee but was suspended from driving in Virginia. Deputy McNally was starting to write up a summons for him when Deputy Yost arrived to pick up Barnett. Deputy Yost pulled his car next to the passenger side of Deputy McNally's car, got Barnett out from Deputy McNally's car, and placed her in his car. Deputy Yost asked Deputy McNally if he needed anything else and Deputy McNally asked him to stick around.

Deputy McNally then told Kirby to get out of his vehicle so that he could talk to him and issue him the summons. Kirby got out and stood in front of Deputy McNally's vehicle, leaving the driver's door to his Tahoe open. Bruce remained seated on the passenger side of the vehicle.

As Deputy McNally began talking to Kirby about the summons, Kirby became very agitated and began to talk loudly. Deputy McNally asked Kirby to take his hands out of his pockets but he refused. Deputy Yost grabbed Kirby's hands, took them out of his pockets and told Kirby that he was going to pat him down. Kirby did not resist. Deputy Yost performed the pat down and found no weapons.

-4-

Both officers then noticed an odor of alcohol on Kirby. Deputy McNally asked Kirby if he had been drinking. Kirby replied that he had drunk some beer. In response, Deputy McNally went to his car and retrived an alco-sensor and asked Kirby if he would submit to the test. Kirby agreed. Deputy McNally instructed Kirby to blow into the tube but instead Kirby inhaled. Kirby repeated the test three times but each time he inhaled instead of exhaling. Deputy McNally informed Kirby that he could still take him in for DUI even if he didn't take the test.

Kirby then asked if his Tahoe would be towed if he were arrested. Deputy McNally replied that the vehicle would not be towed if the passenger was sober. After hearing this answer, Kirby bolted and ran to his vehicle. Deputy Yost pursued and grabbed him, and during their struggle they both fell into the Tahoe on the driver's side. Deputy Yost tried to pull Kirby out with his left arm around Kirby's chest. Deputy McNally grabbed Kirby's left leg which was slightly out of the driver's door. Kirby then put the key in the ignition, started the vehicle, placed his foot on the accelerator, and the officers heard the engine revving up. In response, Deputy McNally let go of Kirby's leg and grabbed the gearshift with his left hand, trying to prevent Kirby from pulling it down into drive. With his right hand, Deputy McNally reached for his pistol—a Glock .40-caliber semi-automatic—and and told Kirby

-5-

several times that he would shoot if Kirby did not get out of the vehicle. Deputy Yost also screamed at Kirby to get out.

The vehicle then went into gear, with the driver's door still open and both officers partially inside, struggling with Kirby. As the vehicle started forward, Deputy McNally lost his balance and saw Deputy Yost's feet start to go under the vehicle. While falling, Deputy McNally fired three shots in rapid succession at Kirby. Two of the shots passed through Kirby's body, striking and wounding both Bruce and Deputy Yost.[3] Deputy McNally fell to the pavement and the Tahoe lurched forward through the parking lot, hitting two cars, and went over an embankment.

Later tests showed that Kirby had a blood alcohol level of 0.19 percent.

The parties substantially agree on the facts, although the plaintiffs present a slightly different version of the struggle between Kirby and the officers, relying almost exclusively on Bruce's deposition testimony. Bruce concurs that deputies Yost and McNally pursued Kirby and tried to grab him, but Bruce contends that Kirby managed to break free from the officers at some point in the struggle and was able to close the door to his Tahoe. The rest of the struggle then happened through

---

[3] The autopsy report showed that Kirby had three close range gunshot wounds—one to the left shoulder, one passing through his head, and the third passing through his chest. Only one bullet was recovered from his body. Bruce was hit in the chest and left wrist and Deputy Yost was struck in the left forearm.

-6-

the door's open window. Bruce also remembers Kirby falling into the vehicle with his back toward the steering wheel but then turning around, putting the key in the ignition, starting the vehicle and shifting into the drive gear. According to Bruce, Deputy Yost then entered the SUV through the driver's window and attempted to take the keys. Bruce heard one of the officers say three times, "[S]top or I'll shoot." (Willis Dep. 45:19.) Bruce, who had not been part of the scuffle, asked Kirby what he was doing as Kirby prepared to leave the scene. Kirby replied, "They want to kill us, we're getting out of here." (Willis Dep. 42:12-13.) As Kirby was making this statement, he was shot by Deputy McNally. According to Bruce, the vehicle did not move forward before Kirby was shot.

II

Defendants McNally and Yost contend that are immune from any claims arising under § 1983 based on the doctrine of qualified immunity. Law enforcement officers performing discretionary functions "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity protects law enforcement officers from bad guesses in gray areas and ensures that they are liable only for

-7-

transgressing bright lines." *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006) (internal quotations omitted) (citing *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). Because qualified immunity is an immunity from suit and not a mere defense to liability, a court should determine whether an officer is entitled to this immunity at the earliest possible stage of litigation. *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001).

The threshold question in determining whether a law enforcement officer is entitled to qualified immunity is whether, "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. If I find that no constitutional right was violated, even when viewing the facts in the best light for the plaintiffs, my analysis ends, because the plaintiffs cannot prevail as a matter of law. *See Jones v. Buchanan*, 325 F.3d 520, 526 (4th Cir. 2003). But if I find that a constitutional right was in fact violated, I must then decide whether the right was clearly established at the time of the violation. *Saucier*, 533 U.S. at 201. A right is clearly established if, "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202.

Here, the plaintiffs allege that the defendants violated the protections of the Fourth Amendment to be free from an unreasonable seizure. Specifically, the plaintiffs allege that Deputy McNally used excessive force in seizing Kirby and

-8-

Bruce. *See Jones,* 325 F.3d at 527 (holding that the Fourth Amendment right to be free of unreasonable seizures includes seizures accomplished by excessive force). The plaintiffs also allege that Deputy Yost is liable based on a theory of bystander liability. I will address each claim in turn.

A claim that a law enforcement officer used excessive force in the course of a seizure "should be analyzed under the Fourth Amendment and its reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (internal quotations omitted). The Fourth Amendment's reasonableness test is objective. *Id.* at 397. Accordingly, a court should not consider the officer's underlying intent and motivation when deciding whether the officer's actions were reasonable. *Id*. Instead, the

> reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id*. at 396-97 (internal quotations and citation omitted).

When considering an excessive force claim, the court must also balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."

*Scott v. Harris*, 127 S.Ct. 1769, 1778 (2007) (internal quotations omitted) (citing *United States v. Place*, 462 U.S. 696, 703 (1983)). While the Supreme Court stated in *Tennessee v. Garner,* that "[t]he intrusiveness of a seizure by means of deadly force is unmatched," the *Garner* Court also held that an officer may use deadly force when there is "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." 471 U.S. 1, 9, 11 (1985).

As the Court recently emphasized in *Scott v. Harris*, "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute deadly force." 127 S. Ct. at 1777 (internal quotations omitted). Instead, courts must look to all of the facts of a case and determine whether the use of deadly force in that situation was objectively reasonable. *Id*. ("Although respondent's attempt to craft an easy-to-apply legal test in the Fourth Amendment context is admirable, in the end we must still slosh our way through the factbound morass of 'reasonableness.'"). The *Scott* Court found that a police officer's use of deadly force was objectively reasonable when the injured party engaged in a high-speed car chase that threatened the lives of innocent bystanders. *Id*. at 779. In reaching this conclusion, the Court noted, "We think it appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability. It was respondent, after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight. . . ." *Id*. at 1778.

Case 2:06-cv-00015-JPJ-PMS   Document 115   Filed 06/19/07   Page 10 of 18   Pageid#: 982

Here, Deputy McNally argues that the use of deadly force to seize Kirby was objectively reasonable because Kirby posed an actual and imminent threat to Officer Yost and to the innocent bystanders in the parking lot. To evaluate this claim, I must determine whether the totality of the circumstances known to Deputy McNally at the time of the shooting would lead an objectively reasonable officer to believe that Kirby posed a threat of serious physical harm to Officer Yost or others. Applying this test, I find that Deputy McNally's actions were objectively reasonable and that he is entitled to qualified immunity as a matter of law.

The plaintiffs do not contest that Kirby attempted to flee, had jumped into the Tahoe, put the key into the ignition, and had shifted the Tahoe into drive. In fact, there are only two relevant factual disputes. First, the plaintiffs contend that Kirby managed to close his door at some point in the struggle and that right before the shooting, Deputy Yost was struggling with Kirby through the door's open window. The defendants claim, however, that the door was open throughout the struggle and that Deputy Yost's body was partially inside the Tahoe. The defendants also disagree with the plaintiffs' assertion that the Tahoe had not started to move forward before the shots were fired.

The mere existence of factual disputes does not prevent a party from prevailing on an otherwise properly supported motion for summary judgment. *See Anderson v.*

Case 2:06-cv-00015-JPJ-PMS   Document 115   Filed 06/19/07   Page 11 of 18   Pageid#: 983

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, the moving party only needs to show that there are no genuine issues of material fact for trial. *Id*. Here, Deputy McNally would be entitled to qualified immunity regardless of the factual disputes described above. Even if the door was closed and only Deputy Yost's arm was inside the Tahoe through an open window, it was still objectively reasonable for Deputy McNally to believe that Deputy Yost and other persons were in danger. *See Elliott v. Leavitt*, 99 F.3d 640, 641 (4th Cir. 1996) ("The Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm.").

Additionally, even accepting the plaintiffs' version regarding the timing of the shots does not make Deputy McNally's actions objectively unreasonable. "The Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists." *Id*. at 643. Kirby posed a threat to Deputy Yost and others whether or not he had actually driven the Tahoe forward before the shots were fired. *See id.* at 644 ("[N]o court can expect any human being to remain passive in the face of an active threat on his or her life.").

While the plaintiffs argue that Deputy McNally's actions were more dangerous than Kirby's, they do not contest that there were others in the parking lot who could have been harmed by the fleeing vehicle. I must view the reasonableness of Deputy McNally's actions from the perspective of a reasonable officer acting in the chaotic

-12-

situation and not second-guess whether his decision to shoot Kirby was actually more dangerous. *See Milstead v. Kibler,* 243 F.3d 157, 165 (4th Cir. 2001) ("But courts cannot second guess the split-second judgments of a police officer to use deadly force in a context of rapidly evolving circumstances, when inaction could threaten the safety of the officers or others") (citing *Graham*, 490 U.S. at 396-97).

The plaintiffs also suggest that the deputies' actions were unreasonable because Deputy Yost could have prevented the situation by placing himself between Kirby and the Tahoe while questioning and searching Kirby. But Deputy Yost's conduct prior to the shooting is irrelevant in determining the reasonableness of the force used. *See Elliott*, 99 F.3d at 643 ("As we noted in *Greenidge*, *Graham* requires us to focus on the moment force was used; conduct prior to that moment is not relevant in determining whether an officer used reasonable force") (citing *Greenidge v. Ruffin*, 927 F.2d 789, 791-92 (4th Cir. 1991)). Instead, what is relevant is the undisputed fact that Kirby intentionally placed himself, Bruce, and innocent bystanders in danger by recklessly attempting to drive off. Taking into account the lives at risk and the relative culpability of the parties involved, I find that the plaintiffs have not met their burden of showing that Deputy McNally's actions were objectively unreasonable. Because the facts contained in the record do not make out a constitutional violation, Deputy McNally is entitled to summary judgment on the Fourth Amendment claim brought on behalf of Kirby.

-13-

Bruce also contends that Deputy McNally violated his Fourth Amendment rights. Deputy McNally argues that Bruce has no Fourth Amendment claim because he was not the intended target of the shooting. I find that because Bruce was not seized within the meaning of the Fourth Amendment, Deputy McNally is entitled to summary judgment on Bruce's claim, even if he acted unreasonably.

The Fourth Circuit recently emphasized that an innocent bystander who is killed while a police officer is attempting to apprehend a fleeing criminal is not entitled to the protections of the Fourth Amendment. *Schultz,* 455 F.3d at 480. "Because the victim was not the intended object of the shooting by which he was injured, he had not been seized within contemplation of the fourth amendment." *Id*. (internal quotations omitted) (citing *Rucker v. Harford County, Md.*, 946 F.2d 278, 281 (4th Cir. 1991)).

Bruce may still have a substantive due process claim, however. The Fourth Circuit recognized in *Temkin v. Frederick County Commissioners*, 945 F.2d 716, 721 (4th Cir. 1991), that an innocent bystander injured by police in a high speed auto chase may be able to bring a substantive due process claim under § 1983. "[I]n appropriate circumstances, substantive due process protections might extend to an innocent bystander . . . even though the restraint imposed upon him by the infliction of physical injury did not constitute a fourth amendment seizure." *Rucker,* 946 F.2d

at 281 (internal quotations omitted). But when physical injury is the basis of a substantive due process claim, the plaintiff must show that the officer's conduct was "a brutal and inhumane abuse of official power literally shocking to the conscience." *Id.* (internal quotations omitted) (citing *Temkin*, 945 F.2d at 720).

The summary judgment record here does not support Bruce's substantive due process claim. Bruce has pointed to no facts that would suggest that Deputy McNally's conduct was such an abuse of official power that it shocks the conscience. Consequently, Deputy McNally is entitled to summary judgment on any claims brought by Bruce pursuant to § 1983.

The plaintiffs also contend that Deputy Yost is liable under a theory of bystander liability. While generally an officer can only be liable under § 1983 for affirmative conduct, the Fourth Circuit found in *Randall v. Prince George's County, Md.*, 302 F.3d 188, 203-04 (4th Cir. 2002), that in certain situations, police officers can be liable for failing to act. In recognizing the existence of bystander liability, the Fourth Circuit stated, "Any rule to the contrary would permit officers to ignore their duty to enforce the law." *Id*. at 204. But for bystander liability to attach, the plaintiff must demonstrate that the bystander officer (1) knew that another officer was violating the plaintiff's constitutional rights, (2) had a reasonable opportunity to prevent the other officer from committing the violation, and (3) chose not to act. *Id*.

-15-

at 204. Because I find that Deputy McNally did not violate either Kirby's or Bruce's constitutional rights, Deputy Yost cannot be liable under a theory of bystander liability for any claims brought under § 1983.

III

The plaintiffs assert state law causes of action based on battery (Count III, Deputy McNally), negligence (Count IV, Deputy McNally and Deputy Yost), and intentional infliction of emotional distress (Count V, Deputy McNally). The defendants have also moved for summary judgment in their favor on these claims.

This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C.A. § 1367 (West 2003). A district court may decline to exercise its supplemental jurisdiction, however, when summary judgment is granted on all claims over which the court has original jurisdiction. *See* 28 U.S.C.A. § 1367(c)(3). But I find that because the plaintiffs' state law claims have been fully developed and presented to this court, considerations of judicial economy and fairness indicate that I should adjudicate these claims. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988).[4]

---

[4] While the Supreme Court's opinion in *Carnegie Mellon University* predates § 1367, the Fourth Circuit has stated that this opinion "continues to inform the proper interpretation of § 1367(c)." *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 616 (4th Cir. 2001).

-16-

As to the plaintiffs' negligence cause of action, the Virginia Supreme Court has set forth a four-factor test to determine whether a government agent who works for an immune governmental entity is also entitled to the protections of sovereign immunity. *Friday-Spivey v. Collier*, 601 S.E.2d 591, 593 (Va. 2004). "The four factors are: (1) the function performed by the employee, (2) the extent of the state's interest and involvement in that function, (3) the degree of control and direction the state exercises over the employee, and (4) whether the act performed involves the use of judgment and discretion." *Id.* at 593, n. 4 (citing *James v. Jane*, 282 S.E. 2d, 864, 869 (Va. 1980)); *see also Colby v. Boyden*, 400 S.E. 2d 184, 186-87 (Va. 1991).

Under Virginia law, a government agent who is entitled to sovereign immunity is not completely immune from civil suit. *Colby*, 400 S.E.2d at 186. An agent whose actions were grossly negligent is not protected by the doctrine of sovereign immunity. *Id.* The Virginia Supreme Court has defined gross negligence as the "absence of slight diligence, or the want of even scant care." *Id.* at 189 (internal quotations omitted) (citing *Frazier v. City of Norfolk*, 362 S.E.2d 688, 691 (Va. 1987)).

The plaintiffs argue that even if the deputies meet the four-factor test for sovereign immunity, they are not immune from this suit because their actions were grossly negligent. But the facts as set forth in the summary judgment record fail to show that either Deputy McNally or Deputy Yost acted with an "'utter disregard of

-17-

prudence amounting to complete neglect of the safety of another.'" *See id.* Instead, the record shows that the deputies attempted to diffuse the situation by trying to physically pull Kirby out of the Tahoe and by verbally pleading with him to get out of the vehicle. Bruce even admits that he heard Deputy McNally repeatedly warn Kirby that he would shoot. I find that the defendants' actions did not amount to gross negligence.

The plaintiffs also assert intentional tort claims. However, for the reasons stated with reference to the § 1983 cause of action, I find as a matter of law that the officers acted reasonably and with justification, and thus are entitled to judgment in their favor on these claims. *See Austin v. Town of Blacksburg*, 66 F. Supp. 2d 771, 776 (W.D. Va. 1998) (entering summary judgment on state law claims in police shooting case), *aff'd*, No. 98-2126, 1999 WL 631247 (4th Cir. Aug. 19, 1999) (unpublished).

IV

For the foregoing reasons, the defendants' Motion for Summary Judgment will be granted. A separate final judgment will be entered.

DATED: June 19, 2007

/s/ JAMES P. JONES
Chief United States District Judge